JONES v. WATKINS

*And twelve other cases, to wit:*

JONES v. CHEATHAM.
THE SAME v. THOMPSON and MANNING.
HARRIS v. THOMPSON.
THE SAME v. THE EXECUTORS OF LEWELLEN JONES.
M'ALISTER v. MOORE, *el al.*
THE SAME v. THOMPSON, *et al.*
HOLMES, BROADNAX *et al* v. THOMPSON, *et al.*
HOLMES v. POPE and HICKMAN.
BRAHAN v. TALBOT.
TURNER v. THOMPSON, *et al.*
GRAY v. POPE.
PETTUS v. THOMPSON.

1. A party under a mistake as to the law of his contract, voluntarily makes payment: Equity will not decree restitution.

2. So if he submits to an erroneous judgement at law, until a writ of error is barred by statute, Equity will not open the judgement at law. Complainants having from an erroneous construction of the statute of February, 1818, "to amend an Act against usury," suffered judgement to pass for, or voluntarily paid the high rate of interest expressed in their notes; when the Supreme Court settled the correct construction of the statute, their remedy at law was barred by the statute of limitations    Equity will not interfere.

3. A party seeking relief in equity against a contract, as usurious under the act of 1805, must shew that he had not adequate remedy at law.

THESE were appeals from decrees of the Circuit Court of Madison county, sitting in Equity. The main points being the same in all the cases, they were all taken up for argument at the same time.

11

The bills filed in 1823, 1824 and 1825, respectively charge: That in 1818 and 1819, the complainants gave their notes to the defendants in the several bills named, or to some of them, for the sums of money in the bills stated, payable at certain periods after the dates of the notes, with interest at three and at five per cent a month, and at various other high rates. In some of the cases, to carry interest from date at these rates; in others, interest from maturity at ten per cent a month, if not punctually paid. That some of the notes were for money lent, but the premium was added to the sum lent, and the whole stated as principal, made payable with interest at the above high rates, at sixty days, or other short intervals; and the notes with the compound interest embodied with the principal, thus several times renewed. Some others of the notes were for goods, &c. sold, or other pre-existing debts. In none was the consideration stated to be a loan. That the complainants were by law, bound to pay only the original debts, with interest thereon at eight per cent per annum. That the defendants had entered into a combination with the monied men of the county, to raise the rate of interest; had full control of it; induced the members of the bar generally to express opinions, that by force of the act of February, 1818, interest must be adjudged on such notes as these, according to the enormous rates therein expressed, and that no tribunal could afford any relief. That by these means, this erroneous opinion as to the law of such contracts, become general throughout that part of the State where they had been made. That the complainants thus ignorant of their rights, deceived and mistaken as to the law governing their contracts, in some instances voluntarily, or without suit, paid the principal and interest as expressed in their notes; in others, judgements were recovered for principal and interest; in others deeds of trust were given, and ruinous sacrifices of their property made by sales under executions or the deeds of trust. That complainants remained thus ignorant of their legal rights until writs of error were barred by the statute of limitations, and are without remedy at law. The bills respectively exhibit statements of the excess of the sums paid above principal and interest at eight per cent per annum, and of the value of the property sold, above its produce at the sales as above mentioned, and pray for restitution, &c. and for general relief.

The answers, with some slight variations in the statements of circumstances, admit that the contracts, payments, judgements, &c. were as stated in the bills; deny all combination to control the rate of interest, or the opinion of the community as to the law of interest, &c. And also, by way of plea, claim the benefit of the statute of limitations in the cases of voluntary payments, and in most of the cases also demur to the matter stated in the bills. Some testimony was read on the trials of the cases, and there were peculiar features in the case of Harris against Jones' executors, which are stated by the Judges in giving their opinions.

By the decrees of the Circuit Court, all the bills were dismissed at costs of the complainants. They appealed to this Court.

The cases were all taken up together, and argued at July term, 1826, by Messrs Kelly, Hutchinson, F. Jones and E. Shortridge, for the appellants, and Clay, M'Kinley and Hopkins, for the appellees. The argument occupied six days, the counsel on both sides going into the examination of the construction of the statute of February, 1818, as well as of the grounds for relief disclosed by the several bills; but the Reporter has not now the materials and opportunity, which would enable him to give even a statement of the several positions taken, and many authorities cited, without doing injustice to the elaborate and able arguments of the counsel on both sides.

The cases having been held under advisement until this term. On Monday the 8th of January, 1827, the Judges delivered their opinions.

LIPSCOMB, Chief Justice.

These cases were argued at last term with much zeal and ability. The time consumed by the argument had so encroached on the term, and so much exhausted the members of the Court, that it was thought best to retain them under advisement. By this course we have lost much of the advantage that would have been derived from the argument; many of the impressions of the moment have been erased or impaired by the action of mind and feeling on other subjects. If, however, it be true that Judges should be all head and no heart, the delay is not to be regretted, as more than an equivalent has been obtained by

the opportunity which it has afforded for patient investigation and cool reflection.

The character of the cases, and the many points presented, opened a fine field for the imagination, and for enlisting some of the finest and best feelings of the human heart; and the opportunity was not left unimproved.

When the strong are seen arrayed against the weak, the rich and influential against the poor and necessitous, Judges are apt to lose the high distinction of abstract intellectual beings, and to be found embodied in soul and feeling with the mass of the human family.

The statute of 1818, under which these cases are said to have originated, has been assailed as weak and unsound in policy, and most ruinous in its effects. The motives of those who were active in procuring its passage, have not been left unimpeached. I was a member of the Legislature, and voted in favor of it. I now believe that it was a rash experiment by an infant government, in the hands of young and inexperienced politicians. My conclusions are however drawn from its practical effects, not from any defect which I have been able to detect in its theory. Some of the ablest men in the science of jurisprudence of whom this age can boast, have maintained, that any restriction on contracts for interest is unsound in policy, and produces the evil intended to be guarded against. We cannot justly charge them with impure motives in maintaining this doctrine. As little ground is there for impugning the motives of those who voted for the statute of 1818. As to the policy of this measure, honest men then and now, and perhaps always may, very sincerely differ in opinion. I will here take occasion to say, that the man who penned the so much abused act of 1818, is now gone where comments on its policy or its results, can never reach or disturb him. I knew him well. His rich intellectual endowments commanded my admiration, and the pure incorruptible principles of his heart, my warmest esteem and friendship. That such a mind might err, is possible, for perfection is not the attribute of human judgement. But that his spotless integrity could ever permit him, in the discharge of a high and honorable trust, to be influenced by personal or factious considerations, not even his bitterest enemy, not the vilest slanderer who ever feasted on all that is estimable in character, can for one moment believe.

But to return to the subject under consideration: The
act of 1818 provides, "that any rate of interest or premium for the loan or use of money, wares, merchandize, or other commodity, fairly and bona fide stipulated and agreed upon by the parties to such contract, expressed in writing, and signed by the party to be charged therewith, shall be legal and recoverable." [a]

This act was an experiment and an innovation on the laws and usages of most of the civilized and commercial communities of the world; and as such, it should receive a rigid literal construction. Its sense should not be so enlarged as to embrace a case not within its letter. The words "*loan or use*" have in common parlance, a distinct appropriate meaning, and are never used for giving day of payment on an absolute sale. It is true that the English statute, fixing the rate of interest expressed in similar terms, has been construed to mean giving day of payment on money due. either for a loan, or for an absolute sale of goods, wares, merchandize, &c. and it will be readily admitted, that whatever construction may have been heretofore given by the Courts to the words and phrases used in a statute, should be sustained, if the reason for such construction still exists. It is not denied that where public policy or substantial justice obviously requires it, Courts should strongly incline to such liberal construction of the statute as will effect the object. That a creditor, giving farther indulgence to his debtor after payment had become due, is entitled to some compensation for such delay of payment, is so obvious to common sense, that it is not at all surprising that courts of justice should have endeavored, by a liberal construction, to bring this case within the statute regulating the rate of interest for money lent; and accordingly, by resorting to some subtlety of reasoning, the English Courts determined, that after the debt became due, the debtor should be considered as a borrower from his creditor. At common law the creditor is entitled to recover damages for the detention of money due. If a case occurred where no interest, by the strict letter of the statute, could be allowed, is it not probable that the Court would decide that the legal rate of interest on money lent afforded an easy and certain measure of damages? I am not certain but this has been the origin of allowing interest in the English Courts, on the giving farther day after payment due on an abso-

lute sale, as contradistinguished from a loan. Again, by a liberal construction of the statute, those who had taken interest in cases not of loan, were, exempted from the heavy penalties of usury. A liberal construction was then invoked, by that humanity which governs every court of common law. But if none of these objects are to be achieved, I cannot believe that we are bound by the same rule of construction. On the contrary, to guard against the results of any new experiment, we should adopt the most rigid and literal construction, as that which the Legislature intended to give to the expressions used.

If I am correct in the principles laid down, the act of 1818, authorised interest to be stipulated at a higher rate than eight per cent, only on a contract of loan, and not on one giving day on an absolute sale or other debt already due. In most of these cases, the consideration was not a loan, and the payment of interest above eight per cent, could have been avoided at law. The complainants either paid the excessive interest voluntarily, or failing to make defence in the actions at common law, judgements were rendered against them for the whole amount of the interest claimed. They have satisfied these judgements, and now seek relief, alleging that they were ignorant that any defence could be made at law, until it was too late to avail themselves of it.

As to the cases of voluntary payment without suit, if money has been paid under a mistake as to facts, relief can be had by a suit at law. As if a security should pay a debt which his principal had already paid, or if a debtor should pay a greater amount than was due by the contract, the money so paid by mistake, can be recovered back in an action for money had and received. A variety of other cases might be put by way of illustration. But if A. enters into so hard and unconscientious a contract with B. that a Court of Chancery would relieve him from its performance, yet after having performed it, Chancery will not afford him relief, or decree that what he has so voluntarily paid shall be refunded : for the contract has been extinguished, and will not be revived for the purpose of giving relief. I believe that no case can be found where money paid voluntarily on a contract, no fraud being practised by the creditor on the debtor, and where there is nothing objectionable in the contract but its naked

hardship, has been decreed to be refunded; no matter how hard and unconscientious the contract may have been. If fraud has been practised, under whatever specious garb, Chancery will expose it to view, and relieve against its effects. But where a settlement has been made by the parties in interest, knowing at the time all the material facts, a Court of Chancery will not disturb it, however hardly it may operate.

The case of Butlers against Haskell, [a] at first seemed to me to impeach the soundness of this position. But on a careful examination, I find that so far from controverting, it supports it. The Butlers had empowered Haskell to recover for them property to a very large amount. Shortly afterwards, and before any part of the property had been recovered, he purchased their interest for less than one fourth of its value. After he had recovered the property, he procured from them an instrument referring to the first contract, and acknowledging its validity. Chancellor Desaussure, gives a most luminous opinion, in which he notices particularly some of the strongest cases of a voluntary settlement. When he comes to sum up the grounds on which he sets aside the settlement, or deed of confirmation, he says that "the inadequacy of the price was so gross as to shock the conscience, and raise that violent presumption against the correctness of the transaction, which amounts to intrinsic evidence. This, coupled with the ignorance of the complainants, their want of full and correct information of their rights and of the value of their property, makes a case of the highest claim to relief." Again, the defendant was the agent of the vendors. to support and establish their claims to the estate, and if an agent is allowed to become the purchaser at all, under any circumstances from the cestui que use, it is of the most imperious obligation on him to shew, that the purchase was perfectly fair in all respects, and is not liable to any sort of objection; but he has not done this, for the objections of gross inadequacy of price, ignorance and necessity on the part of the vendor, and skill on the part of the purchaser, are made with irresistible force by the principals against their agent, the purchaser. And finally, this very strong case is not weakened by the acts relied on by the defendant as confirmation. For the ignorance and necessity of the complainants remained, and they were not aware that the contracts could be im-

JANUARY 1827.  peached, and that they could be relieved; and what they
did, was in compliance and submission to the original
contracts. It will be seen that this was the case where
an astute and cunning agent had abused the confidence of
his principals, and purchased the property for less than
one fourth of its real known value. The first contract
was void. A trustee has such opportunities to impose on
his *cestui que trust*, that a purchase made by him during
the continuance of the trust, is always evidence of fraud.
It is like making a contract with an infant. The opinion
of the Chancellor does not in the least impugn the princi-
ple, that where a settlement has been made with a full
knowledge of all material facts, a Court of Chancery will
not again rip up the transaction, on the ground of hard-
ship or mistake in law.

*Jones*
*v.*
*Watkins.*

In the cases now under consideration, the payments
were made in strict accordance with the intention of
the parties when they entered into the contracts, and
although most of the notes were not for money lent, both
the makers and payees believed that the act of 1818, au-
thorized the receipt of the interest stipulated. The com-
plainants allege no fraud, nor do they deny that it was
their *bona fide* intention to pay the interest expressed in
the notes. If they have voluntarily paid it, I know not
on what principle they can expect relief. Courts of Chan-
cery have often been invoked to carry a contract into
effect according to the *bona fide* intention of the parties;
but now for the first time, we are called on to control by
our decree, the honest intention of the parties to the con-
tract, after it has been fully executed. It has how-
ever been urged that the enormous rate of interest stipu-
lated, is an evidence of fraud, and that payment was made
under the influence of the same fraud. It is true that a
glaring disproportion between the price given, and the
value of the thing purchased, has been held to be the
livery of fraud, and where the vendor's situation has
been in any wise influenced by the purchaser, a Court of
Chancery will consider the sale fraudulent. But in no
case I believe, has it been settled, that naked inadequacy
of price *per se* constitutes fraud. The cases going most
strongly towards the support of this doctrine, are cases in
which the disproportion between the price given, and the
value of the thing sold, is such as to startle the con-
science at the first blush. In most of them, from one third

to one sixth of the real value. All these cases too, de-
rived aid from other circumstances; such as the relative
situation of the parties. In the case already noticed,
where less than one fourth of the real value had been
given, Chancellor Desaussure thought it necessary to
couple the inadequacy of price with the facts that the
vendee was the agent of the vendors, and that they were
ignorant of the value and amount of the property sold.
If, however, it were admitted that mere inadequacy of
price would constitute fraud, it would be extremely diffi-
cult, if not impossible, to apply the principle to the cases
under consideration. There is no great difficulty in
ascertaining the real value or market price of any named
article of property. If it is sold by a person in very indi-
gent circumstances, at a price greatly below what it would
command in market, fraud might naturally enough be
presumed. But it is not so with money; it is impossible
even for those engaged in commerce and stock exchange,
to fix any thing like a standard value of money. To the
miser it affords none other than the pleasure of looking
on his hoarded treasure, and his fear of losing it would
restrain him from lending at any rate of premium that
could be offered. The free liver would put no other
value on his money than as the means of purchasing the
comforts and enjoyments of life; while the enterprising
merchant would fix its value by various and complex cal-
culations, depending much on his talents for speculation;
and would often hesitate to limit the gain on a particular
sum to any rate of premium, however extravagant. One
of the most distinguished political economists, after ac-
knowledging the difficulty in forming a correct estimate
of the value of money, fixes it at half the amount that
could be made by trading on it, and assumes that twelve
per cent per annum is a fair profit in trade, but admits
that this rate would vary in different countries. In Ben-
gal, from 40 to 50, and in Turkey 25 per cent would not
be thought unreasonable interest. In old countries sub-
ject to but little change, every branch of trade (unless
monopolies prevent it,) will soon be so stocked and regu-
lated, that the fair gain in any one, cannot long remain
disproportionate to the rest. When the government is
unstable, and does not afford sufficient protection to pro-
perty and persons, few will venture into market; there
will be little competition, and great profits may often be

made by the few who so venture. This seems to be the true reason for the high rate of interest in Bengal and Turkey. In new countries, where new channels of trade and commerce are continually opening, and the staple commodity frequently changing, great profits will be realized and high rates of interest given. The history of our own country ard times shews, that the two extremes of prosperity and adversity approximate so closely, that it is difficult to define the boundary. Suppose that on the eve of one of these great changes in the prices of property, A. sells a slave to B. for $500, (the full estimated value of the slave at the time,) on a credit of sixty days. Before the expiration of the sixty days property of this description has been enhanced 100 per cent. A. calls for payment, it is not convenient for B. to pay, and A. proposes a recision of the contract. B. objects, that the slave is now worth double what he had agreed to give, but he is unwilling to sell him, because his services for the year in the cotton field will be worth 4 or $500. But as an honest man, he is willing to pay to A. a fair equivalent for the delay, and promises him 50 per cent for one year. Now if B. makes 4 or $500 by the slave's labour for the year, and then sells him for $1000, no one would say that the high rate of interest made the contract fraudulent on the part of A. But if B. should be disappointed in his calculations, and at the end of the year the prices of slaves and of cotton should be reduced to what they were at the time he made the purchase, according to some casuists, the contract for 50 per cent interest would be fraudulent. Thus making a contract fraudulent or honest, according to the times, or changes in the market, and not according to the circumstances under which it was made. Such a principle, no rule of ethics can bring my mind to assent to. The case put is supposed to be between two honest and conscientious men. If the 50 per cent has been paid, I cannot see how a Court of Chancery, doing justice between man and man, can decree restitution, although the rate of interest for prolonging the time of credit was very high.

Where the actual consideration was the loan of money, how far can the high rate of interest paid, be a just ground from which fraud should be inferred? Loans are not often made to the indigent and necessitous man, hard pressed to provide a subsistence for his family. He may sell

his last cow, or his last bed, at an inadequate price, to pre-
vent his child from suffering for bread, but he cannot
give such security as the money lender would require.
It is the man of property, and the speculator, who can
bargain with the money leuder. He believes that by specu-
lation, he can make great profit, and that by giving a
high premium for money, he can increase his already am-
ple fortune. The man having extensive property in pos-
session, moving in splendor, and indulging in all the luxu-
ries of life, prefers giving a high rate of interest to the
curtailment of his expenses. Such contracts are often
between persons who are under no obligation to be gene-
rous, from the relation in which they stand to each other.
They frequently occur without confidence being abused,
or necessity taken advantage of. A Shylock on the one
hand, practising every dirty trick which his cunning can
suggest, and on the other, the cold-blooded heartless spe-
culator, who after having separated husband and wife, pa-
rent and child, severed the dearest ties of nature and vio-
lated all the obligations of religion in his thirst for gain,
can repose undisturbed by any other reflection than the
calculation of his per centage on his traffic in human be-
ings, human misery and tears. It would be much more
satisfactory, and much more consonant to equity and
good conscience, could both parties in such transactions
be punished. But as that cannot be done, the maxim,
*in pari delicto possidentis melior est*, must prevail.

From every view which I have been able to take, my
mind is brought to the conclusion, that the high rate of
interest stipulated, is not *per se* sufficient to sustain the
inference, that the contract was fraudulent, and that
where there has been no fraud or mistake as to facts, the
complainants are not entitled to relief.

In these cases, defence as to the excessive interest,
might have been successfully made at law. The reason
assigned by the complainants for not making such defence
is, that they were mistaken as to the law; that accord-
ing to the then prevailing construction of the act of 1818,
the interest was recoverable; that the error in the judge-
ment at law had been cured by the statute of limitations,
before a judicial construction had been given to the sta-
tute of 1818. The respondents rely on the grounds, that
defence might have been made at law; that ignorance of
law is no ground of relief, and on the statute of limitations.

Jones
v.
Watkins.

Strictly speaking, the statute of limitations does not govern a Court of Chancery; but it is adopted as a convenient rule, to be so applied as not to protect a wrong. This rule, though, is more applicable to cases where Chancery had exclusive original jurisdiction. In cases of trust, the statute will not be applied until the expiration of a limited trust. The trustee will not be permitted to plead it against his *cestui que trust.* In cases of fraud, it will run only from the discovery of the fraud. But it has never been held that a Court of Chancery should set this rule aside, in order to restore a stale remedy at law, in a case where the complainant had not been induced by the defendant, to forego his legal defence or remedy If the respondents had practised on the complainants, and induced them to submit to the judgements at law until the time which will bar a writ of error had elapsed, Chancery for such fraudulent practices, would grant the same relief that could and would have been obtained at law. But if there has been no fraud, and a defence clearly legal has been neglected, the Court of Chancery will not open the judgement to let in such defence.

The case of Lewis and Otey against Ewing and Clemens, has been relied on by the complainants, to shew that this Court has granted relief in Chancery after a defence at common law had been waived. That case was decided without much reflection. It was not argued, but was submitted with cases which had been argued on the common law side of the Court, and it is probable that a decree was made without sufficient attention to the fact, that a defence good at common law had been neglected. This must account for the superficial reasoning of the decree. The case too exhibited many badges of fraud, deceitful practices and combination against the complainants. The note was procured through the intervention of a third person, pretending that he had an interest when he had none; and such combinations were continued up to the closing scene. procuring the judgement at law to be affirmed in the Supreme Court by consent.

It was further contended, that when a defence at law is doubtful or difficult, Chancery will grant relief. This applies only to cases of doubtful jurisdiction, where there is clearly a remedy before one tribunal or the other, and it is doubtful whether a full defence can be made at law; but it does not apply to a case in which it is doubtful

whether a defence can be made at all in either Court.

But admitting the rule to the fullest extent contended for by the counsel for complainants, it admits of no excuse for not resorting to a Court of Chancery, as soon as that doubt and difficulty appeared. If the delusion as to the correct construction of the act of 1818 had been produced by a fraudulent combination of the respondents, inducing the members of the bar to lose sight of their high character, and join in supporting a construction which they knew to be erroneous, if relief had been asked in time, it would have been granted. Time it is true, cannot purify what was corrupt in its inception, but if one, after knowing his injuries, sleeps over them until the time has elapsed which the Legislative wisdom has fixed as a limitation to bringing a suit at law, or to proceedings to reverse an erroneous judgement, his complaint would appear in a Court of Chancery under a very unfavorable aspect.

I believe that I have examined every principle embraced by the arguments of the solicitors for the complainants. It remains to apply the principles to the several cases held under advisement.

In the bill Harris against Jones' executors, two distinct complaints are embodied. The first has no connexion with the statute of 1818. The complainant alleges that as far back as 1814, being indebted to one Ward, and Ward being indebted to the testator of respondents, by an arrangement between them, complainant gave his note to testator for the amount which he owed to Ward, and gave a separate note for usurious interest; that he continued to settle with the testator until 1818, when the whole transaction was closed; that usury was always exacted. In the last note forty per cent.

The settlement made in 1818 was voluntary. The complainant assigns no reason for not having resisted the exaction of usury, other than that through the influence of the money holders on public opinion, it was thought disgraceful to resist the payment of any rate of interest which had been stipulated. Mistaken notions of the law appear to be the grounds on which relief is sought in some of the cases, but in this case mistaken notions of honor and morals seem to be relied on, and it is not pretended that the complainant was ignorant of his rights at law. He declares that when he gave his last note, and stipulated for the payment of interest at forty per cent, he

considered it a choice of evils, and did so rather than submit to a greater sacrifice. If we are to understand by submitting to a greater sacrifice. letting his property go for the payment of the debt, there is no evidence that the respondent's testator in any way influenced his choice of evils. The complainant voluntarily complied with the hard terms of his contract, according to his then notions of good faith, whether orthodox or not. For it is very clear that he did not believe himself bound by law to such compliance. If he paid usury, he had ample remedy at law to recover it back. The statute of 1805 expressly gives this remedy.

His second ground of complaint is, that one Bradford was indebted to respondent's testator in a considerable sum; that when the note became due, the testator through the agency of his son, one of the respondents, demanded a new note, with twenty per cent added to the principal; this being the amount of interest stipulated by the first note, and offered to lend $500 in addition to the existing debt and interest, on condition that Bradford would give a new note with security, consolidating the whole amount with interest from the date until paid, at the rate of twenty per cent; that Bradford being an imprudent man, embraced the proposition, and gave his note with the complainant as his security: that judgement at law has been recovered against complainant for the whole amount, with interest as stipulated, and satisfied by sale of his property; that he did not discover his mistake as to the law, until three years after the judgement, and had neglected to make defence at law, or to take out a writ of error, until it was too late; and further, that relief could not have been complete at law.

In argument it was insisted, that a court of law could have relieved only against the interest stipulated in the note, and not against the usury embodied in it. There is no testimony, and the respondents in their answer, traverse the consideration of the note. If there had been any taint attached to the contract that could not have been reached in a court of law, it should have been shewn by proof. The testimony of Mr Mead, the clerk, taken for the respondents, shews that a writ of error was sued out within three years from the rendition of the judgement. What has become of this writ of error, we are not informed. If still pending in the court of law,

that Court will best know how to dispose of it. Until

this has been done, Chancery could not decree restitution of the money paid in submission to the judgement. From the bill, answer, and testimony, it does not appear but that complete relief might have been had by timely resort to a court of law, and no sufficient reason is shewn why this course was not taken.

The case of Freeman Pettus against Robert Thomson, is one of voluntary payment. There is no evidence of fraud, or that any fact material to the complainant's interest, was concealed from him, nor does any thing appear to authorize a Court of Chancery to rip up the transaction, after it has been settled by the parties.

All the other cases can be disposed of on the principles as decided in these.

## JUDGE SAFFOLD.

THE very able and protracted argument of these cases, the many authorities cited, the importance of the controversy, and the variety of the questions presented, combine to render me fully sensible of the difficulty and responsibility of the decision to be now made. I must content myself with a faithful endeavor to arrive at a correct conclusion, without attempting a full elucidation of it by reference to many authorities; the authorities cited are too numerous to receive special notice, and to several of them I have been unable to obtain access since the argument.

Most of the questions involved, apply alike to all the cases, and it will be unnecessary to notice their separate application to each.

These controversies originated under different constructions of the statute of 1818, " to repeal an act against usury." Regarding this statute as conferring a new, important, and delicate power, derogatory to the protection which the common law, and the policy of every commercial country appears to have considered necessary for the security of the inexperienced and necessitous part of the community, I think that the statute should receive a strict, literal and beneficial construction, so far as its language, reason and spirit will admit. Some notice seems necessary to be taken of the two first points made in the argument. As to the first, I entertain the same opinion which I gave in the case of Henry and Winston against

JANUARY 1827.

Jones
v.
Watkins.

a Minor's Ala.
Rep.209.

Thompson, [a] and the other cases on the construction of this statute, decided at June term, 1824; that the language of this statute is sufficiently broad to include all written contracts founded on a sufficient consideration, whether specifically expressed or not, and that it is not material that the consideration should have been for money actually lent; that the words " for the loan or use of money, wares, merchandize or other commodities," in their uniform sense as established by a long course of legislative and judicial construction, in England and in the United States, extend to all written promises, in the usual form, for the payment of money ; and when the rate of interest or premium is expressed in the instrument, it is under this statute, recoverable for the time of forbearance fairly and unequivocally agreed upon by the parties.  "Words and phrases, the meaning of which in a statute, have been ascertained, are, when used in a subsequent act, to be understood in the same sense." In addition to the reasons which I have heretofore advanced in support of this construction, it seems to me that the reason and policy of this statute equally sustain it. The chief design of all laws, limiting the rate of interest, has been the protection of *borrowers of money* more especially than other debtors.  More danger of an exorbitant rate of interest is to be apprehended on the loan of money, than on contracts for the purchase of property, or for giving further time for the payment of pre-existing debts. Men seldom feel the same necessity or desire to buy any specific article, as for the immediate use of money ; and when they must purchase, the field of selection is more extensive, and the danger of oppression less, than in borrowing money, the opportunities for which are rare, the value the same throughout the country, and the facilities for combinations great.  Hence I confidently think, that to authorize the conclusion that the Legislature of 1818, whilst removing all restraint on contracts, for the interest of money lent, intended to continue it on other contracts, where less oppression was to be apprehended, the statute should have been expressed in a different phraseology than that ordinarily used in other statutes on the same subject, enacted in this and the other states of the union, and in the country from which we have borrowed most of our law language.  But Legislatures in the language usually adopted, and Courts in the construction of such

statutes, appear to have proceeded on the principle that
a debt payable at a future day, always presupposes a loan,
and in legal contemplation is such. Under a strict and
literal construction of the statute, what effect is to be
given to the words " goods, wares, merchandize, or other
commodity?" Were not premiums for the loan or use of
these, within the operation of the statute? And if they
were, I cannot perceive the policy of refusing similar pro-
tection to contracts for premiums on debts contracted by
the sale of such articles.

As to the argument drawn from the decisions on the
*fourth* section of the English statute of frauds, (the lead-
ing case among which is Wain against Warlters, [a] it is to
be observed, that these decisions were founded on the
spirit and policy of that statute. To effect its object, and
exclude all the danger of perjury that was to be appre-
hended from the nature of the contracts referred to, the
construction was given, that the word " agreement" in
such cases of *simple* contracts as the statute required to
be in writing, applied as well to the consideration as to
the promise. The reason assigned was, that neither could
safely be left to depend on the uncertainty of oral testi-
mony. But as to our statute of 1818, I cannot perceive
any such principle of policy for distinguishing between
contracts for money lent, and contracts on considerations
equally valuable, when the debtor instead of making im-
mediate payment, is permitted to retain and use the mo-
ney during the term of credit. As I have already ob-
served, I think that policy would operate with more force
against the removal of the restrictions as to interest on
contracts of the former, than of the latter description.

[a] 5 East 10.

I think it also worthy of consideration, as contended on
the part of the appellees, that though the word "agree-
ment" in the fourth section of the English statute of
frauds, was construed to include the consideration, yet the
word "bargain," in the seventeenth section of the same sta-
tute, was held not necessarily to include it. [b] If my con-
struction of the statute of 1818 is correct, and only the
rate of interest or premium is required to be expressed in
writing, it is so expressed in these contracts ; but if it be
considered that the statute requires that the contract
should be expressed in writing, and this word bears a
stronger analogy to the term "agreement" than to the
term "bargain," (I consider all three as synonymous,) then

[b] 6 East. 307.

13

JANUARY 1827.

Jones
v.
Watkins.

the decisions on the fourth and seventeenth sections of the English statute of frauds conflict with, and paralyze each other ; and though the case of Wain against Warlters appears to have been decided by learned judges. who were ornaments to the bench, the doctrine has since been much questioned by high judicial authority, shewing in several cases doubts, evasions, dissatisfaction, and *force of reasoning*, sufficient in my conception, to overrule it. [a]

*a* See 14 Ves. 189, 15. Id. 286, Roberts on Frauds 117, note 58. 5 Mass. R. 358.

As to the second point made in the argument, can an exorbitant rate of interest, for a failure to pay at the time agreed on, be stipulated and recovered under the statute?

If by the legal construction of the contract, the stipulated premium cannot attach at any time, or should begin to run at a later, or cease at an earlier period, than was expected by either or both of the parties, such construction would not impair, but would preserve the contract in full force according to its legal effect. Thus, in a note for the payment of interest from the date, if the principal be not punctually paid, the back interest is to be rejected as penalty. So where the agreement is absolute to pay interest from the date, accompanied with a stipulation that if the debt be not punctually paid, the rate of interest after maturity shall be increased, such additional interest will be rejected as penalty. These rules of construction have been adopted on the principle that such rigorous stipulations were inserted merely to induce punctuality, that it cannot be unreasonable to suppose that the parties, (expressing fairly and bona fide the terms of the contract,) intended that payment should be made at the time appointed This was the primary obligation ; the other terms were only secondary or accessional. In thus viewing the subject I may add, that according to the only strictly legal notion of a loan which I can form, there must be an agreement for forbearance during the whole term of the loan. It will be recollected that the statute in question contains no provision for continuing the stipulated interest, after the maturity of the debt, either until judgement recovered or payment made. Unconscientious bargains and contracts on grossly inadequate considerations, whether claiming the protection of a statute conferring new powers or not, are subject to judicial control. [b]

*b* 1 Pothier 204, 209, 212. 2 Com. on Con 537 to 546. 2 Vernon 289, 316. 1 Fonb. 151, 306, 7, 8. Ord. 49, 32. 2 Cowper, 933, 795 Ib 112, 116. 7 Mass. R. 112. 12 Ib. 366. Newland 360.

But if more interest than the debtor was legally liable to pay has been paid, collected or recovered by a judge-

ment which remains in full force, can Chancery afford relief?

For the appellants it is contended, that from the hardship, oppression and fraud of these contracts, the maxim *volenti non fit injuria* does not apply to prevent relief against mistakes, either as to the law or the facts; that the payments were made, or judgements permitted to be recovered, from the ignorance of the appellants as to their legal liability: that as to the concealed premiums, (not distinguished in the notes from the principal,) Chancery has exclusive jurisdiction, and that its jurisdiction is concurrent as to the other classes of contracts.

That a mistake as to the law, (with a knowledge of which every one must be charged,) is no ground for equitable relief, is confessedly correct as a general principle; but relief may be, and has often been decreed in cases of mistakes in law, induced by the fraud or circumvention of the party profiting by it: or where the principles of natural justice and good conscience strongly demand relief. In the exercise of this equitable power, Courts have strict regard to the extent of the injustice, and particularly to the relative situation of the parties. Fraud may be presumed in equity from circumstances, (in the absence of any evidence to the contrary,) as the weakness and necessity of one party, and the extortion and oppression of the other; or fraud may be inferred in some cases from the extreme unconscionableness of the bargain. [a]

[a] 1 Atk. 83, 352. 14 Ves. jr. 115, 241, 2, 3. 10 Id. 446. 13 Id. 103. Newland 432. 3 Ves. jr. 446. 4 Mun. 68. Id. 328.

But in the cases under consideration, from the circumstances as developed by the bills, answers, exhibits and depositions, I do not discover any suppression or misrepresentation of facts sufficient to establish fraud in the contracts. Of their hardship, oppression and inadequacy, there can be no doubt. The unreasonable premiums may well warrant the conclusion, that the appellants were necessitous, or greatly infatuated with the spirit of speculation, and that the appellees availed themselves of this necessity and delusion. I entertain no doubt that a certain degree of hardship and inadequacy, under peculiar circumstances, is a ground for equitable relief. It is true such relief is more appropriately due to heirs, unaided females, sailors and weak minded individuals in distress, disposing of their rights in expectancy; but I think the authorities shew that such relief is not confined to persons of this description. Where extraordinary circum-

stances have given to one party, in an unconscientious bargain, a commanding influence over the other, if remedy cannot be had at law, equity may afford relief if sought in due time, and before a subsequent confirmation of the contract.

Before the voluntary performance or judicial adjustment of these contracts, it might not have been irrelevant to consider what view should be taken of a contract for the payment of a premium for the use of money of five or ten fold its value, according to the usual estimate: At least this view might not have been irrelevant as to such portions of the premiums as were not explicitly and unconditionally expressed in writing. Although at the date of these contracts, interest at the rate of sixty or one hundred and twenty per cent per annum may have been rendered familiar to the people in some parts of this State, I presume the time has been when such rate would have excited surprise, and perhaps exclamation there, as it would now, and at all other times in most parts of the United States.

But the appellants had in these contracts, the sanction of the celebrated statute of 1818. The contracts appear to have been made between persons capable of any calculation involved in them, and in all probability, when made, were fully understood by the parties; then fraud cannot be presumed from the mere enormity of the premiums.

The bills charge that the defendants participated in forming a system to monopolize the money of the country, to control its market, dictate the rate of interest, and to inculcate the opinion that the recovery of the premiums was inevitable according to the laws of the country. The answers however deny any fraudulent combination, and aver that the contracts were made in good faith. Whether any thing in the nature of fraud can be inferred, from the creditors having inculcated the doctrine that the recovery of the premiums could not be resisted, depends on their having in this matter represented their views of this question truly or falsely. No judicial decision on it had at that time been made, and it is not to be inferred that they expressed any other than their real opinions. The sole ground on which the appellants endeavor to avoid the effect of their delay in seeking relief, and of their having made voluntary payment in some of the cases,

and suffered judgements at law to be rendered in others,
is their mistake as to their legal liability. I am of opi-
nion that so far as relief at any time could have been ob-
tained in any of these cases, courts of common law and of
chancery, were alike competent to afford it. It has not
escaped me, that in some of the cases premium, or pre-
mium on premium, has been incorporated in the notes,
undistinguished from the principal: but as the debtors
voluntarily converted such premiums into principal, and
in accordance with the statute, bound themselves abso-
lutely for its payment, I discover no authority on which
they can be rejected, if premiums at the same rate, can
be recovered under any circumstances whatever; and as I
think that such as depended on no contingency, were re-
coverable under the statute, I can view these in no other
light.

I hold it as a principle, well founded in reason and autho-
rity, that the voluntary performance of a contract, or suffer-
ing judgement to be rendered on it, without attempting
such defence as might have been available, (the defendant
then having knowledge of all the material facts,) renders
subsequent relief extremely rare and difficult; and I con-
sider that there is little or no difference, so far as these
cases are concerned, whether the adjustment has been
made in one way or the other. These adjustments were
made some time after the original contracts; the debtors
must have had full time to reflect and obtain advice. By
their voluntary performance after this, they shewed their
confirmation of the terms. In the cases in which judge-
ments have been rendered and satisfied, settlements have
been made by tribunals of competent jurisdiction. As
to some of these judgements, writs of error were barred
by the statute of limitations before the institution of
these suits. As to all of them, one tribunal is unneces-
sarily abandoned to resort to another. But every tribu-
nal should shew respect and comity to every other of
equal or superior jurisdiction, so that the boundaries of
their respective jurisdictions may be preserved, and that
litigation may terminate according to some established
rule. If these appellants can now obtain the relief sought,
it must be on the ground of their mistakes as to their
remedy at law, mistakes not produced by any fraud in the
other parties; and the effect of the statute of limitations,
of the confession of judgement in some of the cases, and

Jones
v.
Watkins.

of express releases of errors in others, must be disregarded.

The counsel for the appellants have referred to some extraordinary cases, where Chancery has interposed to correct errors of Courts of competent jurisdiction, and to many were the relief sought could not be obtained at law.

But in all such cases, the equitable relief must be sought in due time, and if a party sued at law would obtain a discovery, and avail himself of facts which he cannot prove in the ordinary way, he must seek the discovery while the action at law is depending, and if he suffer judgement, he cannot be relieved without shewing sufficient reasons for the delay.

Without entering into a particular examination of the many cases cited as to the effects of mistakes in law, (for comment on them in detail would fill a volume,) I think it must be conceded that there has been considerable conflict of decision as to this matter, and that the relief has depended much on the peculiar circumstances of each case.   With all the aid, however, which I have been enabled to derive from the unusual exhibition of learning, research and ingenuity in the argument, and from my subsequent researches, I have been led to the conclusion that the preponderance of authorities is unfavorable to relief in cases similar to these under consideration. [a]

v 4 John. Chan. R.
566, 85. 1 Idem.
49, 320, 512. 2 Id.
51, 60, 2 H. & M.
13, 139, 575. 4
Id. 455. 14 John.
R. 501. 2 Id. 165.
9 Whea. 532. 2
Mun. 31.

In this conclusion I am considerably influenced by the consideration, that it may be deemed certain that when the contracts were made, the debtors expected to pay the stipulated interest, at least, until the maturity of the debts ; that as the principles of relief had not been established by any judicial decision, they may have preferred to make voluntary payments, rather than litigate the question ; and if now on the authority of a subsequent decision, we were to rip up former settlements and judgements, it would be a precedent tending to render private rights fluctuating to an alarming extent.

In some of these cases, judgements were rendered on confession, which by statute, amounts to a release of errors ; in others, formal releases of errors have been given, which are conclusive if there be no other objection to them than the want of consideration and ignorance of the law as to the benefits surrendered.  I cannot consider the regular prosecution of any legal process, or the ordinary pressure of an execution, as sufficient ground of relief against any act voluntarily done to avert it.

As to the question raised in the argument, whether the
statute of limitations applies to suits in equity? In the
case of Murray against Castor, [a] Chief Justice Spencer
(a majority of the Court concurring with him) says,
" that strictly speaking, the statute of limitations does
not apply to a Court of Equity; that Court has adopted
it as a fit and convenient rule, but with its own restric-
tions, which are, that in cases of fraud and trust it shall
not apply." " Where there is a concurrent jurisdiction
in the Courts of common law and equity, the rule must
be the same, and the statute may be pleaded with the
same effect in the one Court as in the other. That in
cases of *trust* and *fraud* peculiarly, appropriately, and
exclusively the objects of equity jurisdiction, according
to the established doctrine, the statute cannot be pleaded."
And in the case of Elmendorf against Taylor, [b] Chief Jus-
tice Marshall, in delivering the opinion of the Court,
says, " although the statutes of limitation do not, either
in England or the United States, extend to suits in Chan-
cery, yet the Courts of both countries have acknowledg-
ed their obligation." He also quotes with approbation
the opinion of *Ld. Redesdale*, "that whenever the Legisla-
ture has limited a period to law proceedings, equity will,
in analogous cases, consider the equitable rights as bound
by the same limitation."

In the case of Radcliff against Warrenton, [c] the lan-
guage " that to consider *time* in equity as at law, is quite
impossible," and " that it is matter of discretion," &c.
and " that way of considering it would avoid all diffi-
culty," I understand to refer more particulary to the
time at which *contracts* must be performed, than to the
limitation of actions.

These authorities do not however, impugn the doc-
trine maintained in other cases, cited in the argument,
that where fraud is the ground of complaint, if the sta-
tute can attach at all, the time can be computed only from
the discovery of the fraud; but in the absence of fraud
or trust, Chancery will refuse relief after the expiration
of the time limited by the statute for remedy at law in
analogous cases.

Then if the maxim *ignorantia juris non excusat*, and
the other objections made, presented no barrier to relief
in these cases, it would remain to be inquired, if relief
was not barred by the statute of limitations; but as I

Jones
v.
Watkins.
a 20 John. R. 576.

b 10 Wheat. 152.

c 12 Vesey 326.

consider the other objections insuperable, it is unnecessary now to inquire whether the limitation to actions on open account, or to actions on simple contracts, applies to these cases.

I am not satisfied that the case of Harris against Jones' executors is not distinguishable from the others, and a case in which Chancery may afford relief; but as in vacation, I had not the means of fully examining the facts, and as a majority have formed an opinion against the appellant, I decline expressing any opinion in this case. As to all the other cases, I am of opinion that the decrees of the Circuit Court should be affirmed.

## By JUDGE CRENSHAW.

MANY of the positions taken in the argument of these cases were considered and settled in the celebrated cases at June term, 1824, on the construction of the statute of 1818. [a] But from the great amount in controversy, and the course which the argument has taken, I presume that the Court are disposed to reconsider at least some of the principles settled by that adjudication. Were it necessary to enable me to attain to a satisfactory conclusion, I should at all events feel at liberty to revise the opinion which I then entertained, for I dissented from the judgement of the Court on that occasion, and stood almost alone on every material point. I have again reflected upon the subject; I have maturely considered the able arguments which have been offered, and the many authorities which have been adduced. I have carefully re-examined my former opinion, and after all, I am yet to be convinced that that opinion was materially incorrect.

On that occasion it was my conclusion, that all the contracts on which the judgements had been rendered, which were then sought to be reversed, were in strict conformity with the requisitions of the act of 1818; that the object in the enactment of that statute was to remove some of the restrictions on usury, and permit men to agree on their own rate of interest, provided the rate agreed upon was expressed in writing and signed by the party to be charged; that the statute required nothing more to be so expressed than the rate of interest, and that this was required in order to prevent doubt and uncertainty and to close the door against fraud and perjury; and I now add that an expression of the rate of interest to

a Minor's Ala. Rep. 209.

make the stipulation and agreement intelligible, necessa-
rily involves or draws along with it, an expression of a
promise or contract to pay the principal debt as well as
the stipulated interest. I further contend "that the sta-
tute did not require the consideration, or the words fair
and *bona fide*, or that the stipulation or agreement was for
the loan or use of money, &c. to be expressed in writing
and that the Court had no right to require that more
should be expressed in writing than was required by the
statute." "That from the second section of the act taken
in connexion with the first, and in reference to the old
law intended to be repealed, the inference was clear, that
the Legislature intended to permit the parties in all con-
tracts which would carry interest by legal operation, to
stipulate their own rate of interest without any regard to
the nature of the consideration." I also insisted "that it
was not material to inquire whether the rate of interest
agreed upon by the parties should be denominated *penalty*
or *stipulated damages*, and that whether penalty or stipu-
lated damages, it was also a rate of interest agreed upon
by the parties and within the provisions of the statute.
That it could not be material at what time interest was to
accrue, whether from the date, or from the maturity of
the contract; whether it was to be conditional or absolute;
in every case it was yet a rate of interest stipulated by
the parties, and within both the letter and the spirit of
the statute." I also maintained, "that if at common law
no more than a reasonable rate of interest was allowed,
the statute made that lawful, which otherwise would have
been unlawful; that the record furnished no evidence of
the value or price of money at the time the contracts were
made, and consequently the Court could not know whe-
ther they were unconscionable, or whether the conside-
ration was grossly inadequate, and that inadequacy of
consideration unconnected with any badge of fraud, mis-
takes, or unfair advantage taken of the weakness, igno-
rance or necessity of a party, would not of itself warrant
the interference of a court of justice.

If we resort to the letter, to the spirit, or the gramma-
tical construction of the statute, and carefully examine
and apply the authorities adduced in the argument of the
present question, they fully and satisfactoril: establish all
these positions; at least to my understanding.

As far therefore as relates to my own opinion, I have

JANUARY 1827.

Jones
v.
Watkins.

said enough to dispose of the cases under consideration; and here my inquiries might stop. *But* as other grounds were relied on, which were deemed by the counsel of vital importance, I conceive it to be my duty to notice some, if not all of them.

It has been ably urged, that from an analogy to the construction given to the English statute of frauds and perjuries, no contract can be brought within the operation of the first section of the statute of 1818, and carry an extraordinary rate of interest, unless the contract and its consideration as well as the rate of interest, be expressed in writing. I have already stated my opinion that this, which is an enabling statute, requires nothing to be expressed in writing but the rate of interest, and that an expression of this necessarily draws along with it the expression of the sum lent, or principal debt due. The statute does not require the contract or its consideration to be expressed in writing, nor, as I humbly conceive, has this Court any right to require it. But the English statute, which is restrictive of the common law in so many words, requires that the *agreement* shall be in writing, and the consideration which is a substantive part of the agreement, must as a necessary consequence, also be in writing. I am not scrupulous as to the nice distinction contended for between the words *contract* and *agreement* ; as far as the present question is affected, I am willing to consider them synonymous, and as signifying a promise or undertaking on a sufficient consideration ; and willing to admit, that if the act of 1818 had required the contract or agreement to be expressed in writing, the analogy to the English statute would hold good ; and it would be necessary to express in writing the consideration as well as the promise or undertaking, as an essential part of the contract or agreement.

It was with much ingenuity contended, that ignorance of the law under the circumstances of these cases, furnished sufficient ground for equitable relief.

Laws are said to be prescribed to operate on every member of the community, and every one is presumed and bound to know them. In this respect, I can find no good reason for any distinction between what may be termed the civil and the criminal law of the country, or in other words, between the laws for the regulation of contracts, &c. and the laws defining and prescribing the

punishment of crimes.  If ignorance cannot excuse the guilt of a crime, it can have as little effect in creating or destroying legal liabilities, or private rights in the trans-actions of men with each other.  No adjudication which in my opinion ought to be recognized as authority, has been, and I presume none can be produced, shewing that ignorance of the law not connected with mistake as to facts, nor induced by fraud, and where no undue advantage has been taken of the party's ignorance, is a sufficient ground of relief from the obligations of a contract. Indeed the very authorities relied on to shew that ignorance of the law has been considered a sufficient ground of equitable relief, go to establish the contrary doctrine. In most of them, and these of the best reputation, independent of ignorance of the law, there were other sufficient grounds to warrant the decisions which were made. I do not recollect that in any one of them, ignorance of the law was considered of itself a sufficient ground for relief.  In my view, such doctrine would be as much against sound policy as against clear law.  I cannot divine how the fact of ignorance could be established.  I know of no means by which it could be proved in a court of justice, unless by the oath of the party, which would hold out such temptation to fraud and perjury, as to create far greater evils than that intended to be remedied.

But what kind of ignorance is alleged in these cases as a sufficient ground to recover back the excess of interest above eight per cent?  In the cases of voluntary payment, it is substantially this : that the debtor paid the money according to the terms of his contract, and as he believed, according to the requisitions of law ; but he was ignorant that on a contract like his, the law would afterwards be differently construed.  In the cases where payments were enforced by judgements, the debtors were ignorant that these judgements might have been reversed.  In both classes of cases, the debtors allege that they were ignorant that it would afterwards be declared by this Court, that the extraordinary rate of interest could not be recovered, because the contracts had not been expressed in writing according to some of the requisites of the statute. In the cases of voluntary payment, if there had been no written contract, the money could not be recovered back. For the voluntary payment was an admission of a sufficient contract, and the debtor of his own accord, per-

formed what the law would have compelled him to per-
form, if there had been a sufficient contract in writing. A
contract intended to be made according to the statute, and
fully executed, cannot afterwards be rescinded because
some of the matters required by the statute to be express-
ed in writing were not so expressed. It can not then be
material, whether the debtor, when he made voluntary
payment, was, or was not ignorant of his legal liability
to pay.

Nor is it material, in the cases in which the payment
was enforced by legal process, whether the debtors were,
or were not ignorant that the judgements could have been
reversed. The argument is, that being ignorant of the
law in this particular, until it was declared by the decision
of this Court at June term, 1824, and writs of error on
these judgements being then barred by the statute of limi-
tations, the parties against whom they were rendered, are
consequently entitled to relief in equity.

As a general rule, this I presume would be dangerous
in its consequences. It might disturb and set aside more
than half the judgements recorded in the State. It would
be a virtual repeal of the law limiting the time for taking
out a writ of error, and subversive of many important
rights.

I readily concede that an oppressive or iniquitous judge-
ment, obtained by fraud, mistake, or surprise, may be re-
lieved against in equity, and that the statute of limitations
does not begin to operate until the complainant has dis-
covered the fraud, mistake or surprise. But if these facts
exist in these cases, from their nature and history, they can
be no better known now than when the judgements were
rendered. Nothing has since occurred to shed new light,
unless it be the decision of this Court in June 1824, and
a knowledge of fraud, mistake, or surprise, could not be
derived from that decision, but from the nature of these
matters, must have been known at, or immediately after
the rendition of the judgements. From that period there-
fore, the limitation to the writs of error began to ope-
rate, and if the evil could have been reached by a writ of
error, a Court of Equity cannot entertain jurisdiction,
although the parties who complain of the judgements,
may have been ignorant that they might have been re-
versed.

But, in some of the cases, it is said that new notes had

been given embracing usury on usury; that this was not apparent on their faces, and at most, was only a partial failure of consideration, not available at law.

To this, the unavoidable reply is, that if unlawful interest be embraced in the note, whether apparent on its face or not, it was an available and proper defence at law; and therefore, is not a subject of relief in equity. It is true, that damages cannot be stipulated for the failure to pay a sum of money, and that Courts of Chancery have concurrent jurisdiction with courts of law. in relieving against penalties; but if the court of law has also ample jurisdiction, and a judgement on the matter has there been rendered, and remains in full force, it is conclusive between the same parties, on the same subject of controversy in all Courts; and equity cannot impeach it, unless it was obtained by fraud, mistake, or surprise, and these matters could not be available in the court of law.

This doctrine is also a sufficient answer to the claim of the complainants to relief, because they were induced to renew their notes, and to make payment in the cases not coerced by legal process, by their ignorance of their rights, and of the law, and without their fault or negligence.

It has been strongly alleged, that these are cases where an undue advantage has been taken of the distress of the complainants, and that hardship, inadequacy, oppression, and fraud, are so manifest as to call aloud for the interposition of a Court of Equity. The record does not establish to my satisfaction, the existence of these facts; and if it did, yet the court of law had ample jurisdiction. The cases have been there adjudicated, and all these circumstances were there available as a matter of defence; and equity cannot now interfere, unless the judgements were fraudulently, or surreptitiously obtained. Nor can equity interpose merely on the ground of fraud in obtaining the notes originally, or in their renewals, (and such fraud is not shewn,) because this was a matter equally available in the trials at law.

It was further alleged, that no statute of limitations could bar relief in equity, and that if the claims of the complainants are subject to the statute, they were in assumpsit, which could not be barred until the expiration of six years, and that the bills were filed within that period.

The statute of limitations was intended to be general in its operation. A claim once barred, is forever barred in

all Courts. Any other construction would defeat the provisions of a law made on great consideration. If there was any ground for equitable relief, the statute began to operate even against the claim to relief in equity, from the time that it might have been probably discovered, and in the present cases, it must have been discovered at the time of paying the money. I think that the Legislature, by the expression in our statute of limitations, " money due by open account," intended to embrace all cases where money was due on any contract, express, or implied, and not reduced to writing, or where the account had not been liquidated. The demand of the complainants must be considered in the light of money due by open account, raised on the implied liability of the defendants to refund, and was consequently barred by the expiration of more than three years from the payment of the money until the institution of these suits. But if the complainants were entitled to a remedy, it was for their money, of which defendants had gained possesion, and in good conscience, ought not to retain, and if recoverable in any form of proceeding, might have been recovered in an action for money had and received, a plain and adequate remedy at law.

The statute of non-claim has been cited as applicable to the case of Harris against Jones' executors, and this statute is express and unconditional, that if the claim be not presented within eighteen months, it shall be forever barred.

As to the charge that there was a combination between the defendants and the monied men of the country, (perhaps the only substantial ground of exclusive equitable jurisdiction, set forth in the bills,) it is denied by the answers, and no proof has been adduced to sustain it.

In conclusion, it was eloquently contended, that in equity every case stands on its own intrinsic merits, and that it hath power to control what is harsh in the application of general rules, and will supply the defects of the law; that justice is a constant and fixed rule in the minds of all good men, to give to every one his due; that it teaches moderation, reclaims the wicked to virtue, and ought to be cherished as life as itself; that equity is as infinite as natural justice, and is what the law does not exactly define, but what the judgements of good men permit

These are indeed excellent sentiments, beautifully ex-

pressed, and shew great moral goodness in the author
who originally conceived them. They were of vast uti-
lity in the despotic ages of England, when the Court of
Chancery began its encroachments on the courts of com-
mon law, and to assume form and symmetry. On these
principles, and to relieve in cases of fraud, accident, and
trust, the equitable jurisdiction of the Court of Chancery
originated; and there has been built a system so complete,
that at this enlightened day, the bounds of its jurisdiction
are as well settled and defined, and it is as much govern-
ed by laws, rules, and precedents, as courts of common
law. This extraordinary power is not to be exercised ac-
cording to the arbitrary or capricious notions of the Chan-
cellor, but must be governed by law and precedent, pecu-
liar to its own jurisdiction. It is a strange idea, and
would be a most dangerous doctrine, that a Court of
Equity possesses an undefined power, co-extensive with
the boundaries of natural justice, unrestrained by rule
and uncontroled by law or precedent; or that it can form
new precedents, suitable to the exigencies of new cases
as they may arise, when by the rules already established,
relief cannot be afforded. Such a doctrine would set the
Chancellor above the Legislative power, and might ulti-
mately subvert the jurisdiction of courts of common law.
In fact the only material difference between courts of
chancery and courts of common law, is in the mode of
proceeding of trial and of relief.

The conclusions at which I have arrived in these cases
are,

1st. That the contracts were within the spirit and mean-
ing of the first section of the act of 1818.

2nd. That the matters alleged as grounds of equitable
relief were available at law, and that the complainants
must be concluded by the judgments at law, in which
they acquiesced, or by their voluntary performance of their
contracts.

3rd. That the right of the complainants to actions at
law, or to writs of error being barred by the statute of
limitations, they are also barred in equity.

4th. That ignorance or mistake of the law, unconnected
with mistake or ignorance of facts, or not induced by
fraud, is no ground of relief.

And that the decrees of the Circuit Courts should be
affirmed.

In attaining these conclusions, I have proceeded with

diffidence of my own ability; and while I acknowledge the lights shed upon the subject by the counsel for the defendants, I must in candour say, that an equal tribute of respect is due to the talents and legal learning displayed by the counsel on the other side; and while I am gratified to find my brethren of the bench concurring with me on any one material point, I avail myself of the occasion to express the most profound respect for their opinions on all points on which it is my misfortune to differ from them.

### By JUDGE WHITE.

As to the construction of the statute of 1818, to amend "an act against usury," [a] I will in the first place inquire, was it necessary to be inserted in the contract or averred in the declaration, that the rate of interest was fairly and *bona fide* stipulated and agreed upon by the parties?

I acknowledge that I cannot perceive the necessity for this, for although the statute uses the words, it does not require them to be inserted. If the contracts were fair and *bona fide*, they were good without the use of these words in the declaration or in the contract; and if unfair and fraudulent, they would have been bad with them. I cannot perceive that the insertion or omission of these words could have enlarged or narrowed the right of the defendants to the actions to avail themselves, by their pleas and evidence, of any fraud or want of good faith, which there may have been in their stipulations for interest.

It has been argued that these notes were defective in not shewing on their face, that the interest agreed upon was for the actual loan or use of money, wares, &c.

With the most respectful deference for those who may differ from me on this subject, it seems to me that when the language of a statute is plain, it should be understood according to its plain and obvious meaning. It is evident from the very title of this act, that the Legislature intended to amend the former law against usury. They designed to make legal, at least in some cases, a contract for any rate of interest or premium; but they also intended to restrict this privilege, by requiring that the rate stipulated and agreed upon should be expressed in writing. Let us examine particularly the expressions of the statute, "that any rate of interest or premium for the loan or use

*a Laws Ala. 443.*

of money. wares," &c. "fairly and *bona fide* stipulated
and agreed upon." What is to be stipulated and agreed
upon? The rate of interest or premium "by the parties
to such contract expressed in writing." What is to be
expressed in writing? Surely the rate of interest agreed
upon; "and signed by the party to be charged therewith."
What is required to be signed? Evidently the rate of in-
terest agreed upon and expressed in writing "shall be
legal and recoverable." What shall be legal and reco-
verable? "Any rate of interest so stipulated and agreed
upon, expressed in writing, and signed by the party to
be charged therewith." But the statute requires that this
agreement should be made by the parties to such contract,
and it is asked what contract is here meant, and who are
the parties? Let it be admitted that the contract of loan,
and the parties referred to, are the lender and borrower;
who necessarily must be the persons who stipulate and
agree about the interest. Does it follow that because the
stipulation for interest is to be between the parties to the
loan, and the rate stipulated is to be expressed in writing,
that the statute therefore requires that it should also
be expressed in writing, that the interest was for the
actual loan of money. wares, &c.? It seems to me that
the one could be, and is required to be done without ex-
pressly requiring the other. True, it is unusual to take
a note for the interest separate from a note for the pay-
ment of the principal, but this does not prove that the
statute requires that any thing more should be expressed
in writing than what it has named, much less does it
shew that it should appear on the face of the note, that it
was for the actual loan of money, &c. The Legislature
in wording the statute, no doubt had an eye to the ordi-
nary course of business; and in the ordinary course of
business, the interest agreed upon would be expressed
in writing in the note for the payment of the princi-
pal. And what, in legal contemplation and in the
sense of the statute, is a note for the payment of money
with a stipulation for interest for its use, but a contract
of loan? If so, the parties are the parties to the contract
of loan referred to by the statute, and where they express
in writing the agreement for interest thus annexed to the
agreement for the payment of the principal, and the party
who is to pay the principal and interest, (the party "to be
charged therewith,") has signed the note, it would seem

that all has been done which the statute requires, and that according to the statute, the interest is "legal and recoverable."

The latter part of the same section, "and no *bona fide* contract shall be vacated, or in any manner impaired, by reason of any premium, or rate of interest, so stipulated and expressed," sustains this position. What is here referred to as being so stipulated and expressed? Most clearly the rate of interest.

Again, by the second section it is provided, "that on all contracts, written or verbal, ascertaining the sum due where no specific premium or rate of interest is expressed, interest shall be taken, &c. at the rate of eight per centum." There is another unequivocal reference to the stipulated interest, as the matter which must be expressed in writing. If the Legislature intended that any thing more should be so expressed, it is strange that in a statute comprised in a very few words, they should three times expressly, or by clear allusion, say that the interest stipulated and agreed upon should be expressed in writing, and not once say that it should be expressed in writing that the contract was for a loan.

It was, however, further contended, that the Legislature did not intend to extend the privilege of contracting for any rate of interest to cases of sales of property on credit, or contracts for forbearance in the collection of pre-existing debts. If this were admitted, I doubt much whether the fact of an actual loan might not have been shewn by proper averments. But some of the contracts, in the cases under consideration, were on sales, &c. and not on the actual loan of money, and it is therefore necessary to examine this view of the question.

It is said that this statute being deleterious in its effects on society, ought to be restrained in its operations to the narrowest possible limits; and that the Court have power to mould it according to reason and conscience to the best and truest use. This is certainly a rule of law, and no one not devoid of the best feelings of our nature, who looks at these cases as a fair exhibit of the desolating effect of this short lived statute, can help feeling the strongest desire to repress the evils and alleviate the sufferings produced by it. But courts of justice are not permitted to *feel*, they are required to *think*. The rule of law referred to, surely does not mean, that Courts when called on to construe a statute passed upon mista-

ken views of policy, found to be inconvenient or mischievous, and soon repealed by the proper authority, are so to mould and direct its bearing, as to give it a different operation from that which was intended by the Legislature who passed it. This would be an usurpation of powers allotted to another department of the government. It would be legislating instead of adjudicating. In the same compilation from which the above rule has been cited, [a] it is said that it is only where the meaning of a statute is doubtful, that the *consequences* are to be considered in the construction ; but where the meaning is plain, *no consequences* are to be considered in the construction, for this would be assuming a legislative authority. The question then recurs, is the language of this statute plain, or is it doubtful? The statute of 1805, entitled " an act against usury," enacts " that no person, or persons whatever, shall take directly, or indirectly, for the loan of any money, wares, merchandize, or other commodity whatsoever, more than the value of," &c. In 1818, the statute entitled " an act to amend an act, entitled an act against usury," and closing with a clause repealing all acts and parts of acts contravening its provisions, was passed. In the first section of the act of 1818, the Legislature have used the words by which in the prohibitory act of 1805, usury was restrained. The single additional word " use," introduced in the first section of the act of 1818, is not found in the corresponding part of the act of 1805. If the word " use" means not the same thing as " loan," it must enlarge, rather than restrict the last and repealing statute. The act of 1818, made to repeal all parts of the act of 1805, which come within its provisions, and to remove the restraints imposed, in describing the contracts from which those restraints were to be removed, uses the same phraseology which had been employed in imposing them. From this simple fact, without calling in the aid of established rules of construction, surely the fair conclusion is, that by the act of 1818, the removal of the restraints was designed to be co-extensive with the restraints which had been imposed, and that the last statute applies to all contracts which had been restrained by the first. It is admitted on all hands, that the act of 1805, the act of 1819, now in force, and the statutes of the other States, and of England, in restraint of usury, all containing substantially the same expressions, are not confined in their operations to contracts

for the actual loan of money, &c. but extend to all other contracts on which interest is usually reserved. It would seem then, that the repealing act of 1818, must be as extensive in its operation. But it is said that the terms of the subsequent parts of the act of 1805, are more comprehensive than those of the first part, or those of the act of 1818. It will be found however, on examination, that they are merely explanatory of the extent of the first part of this act; and do not include any new description of contracts. The first part of the first section contains the prohibition, the latter part prescribes the forfeiture; and as it would be unreasonable that a forfeiture should be incurred, disregarding a prohibition, in a case to which the prohibition itself does not extend, the latter words can be viewed only as a legislative exposition of the extent of the prohibition. The same may be said of the second section of this statute, which gives an action on the case to the person who pays, against him who receives illegal interest. It is evident that this action was given to deter from the taking of usury contrary to the provisions of the statute, and that the right of action under this section, does not extend to cases of contracts. as to which the statute had not already prohibited the taking of illegal interest. It seems evident then, that the latter part of the first and second sections of the act of 1805, does not extend the meaning of the first part of that act.

But this statute of 1805, with the legislative expositions of its extent, must have been in the contemplation of the Legislature, when they passed the act of 1818, to amend it, and by adopting the phraseology of the act of 1805, they must have intended to include the same descriptions of contracts. The statute of 1818, does not contain similar provisions and explanations to that of 1805. They were necessary to enforce the prohibitions of this act, but cease to be so with the repeal of the prohibitions which they were intended to enforce.

Again, as the words and phrases in the statute of 1818, descriptive of the contracts on which any rate of interest might be stipulated, are the same (in some instances verbatim and in all substantially,) with those used in other statutes, to describe the contracts on which usury was prohibited, we must conclude that the Legislature, by adopting them, designed to use them according to the precise and settled meaning which they had already

acquired from their use in previous statutes ; and according to this, they comprehend all contracts on which interest is usually reserved, and we cannot attach to the same words different ideas, when used in different statutes, merely because we may believe one statute to be salutary, and the other to be hurtful in its operation.

The meaning of a statute is the intention of the Legislature therein expressed ; to ascertain this intention, we look back to the history of the time in which it was passed. The framers of this law, however much they may have been mistaken, expected good to result from it. It will be remembered that the opinions which produced it, were then prevalent in many of the United States, and were vindicated by elaborate publications in Europe; that the statute passed without a dissenting voice, and that even now after it has palsied much of the energies of the country, as with the very blast of death, the principles on which it originated are considered by some as beautiful in theory. Then we must suppose that the Legislature intended this law for good, and calculated not merely to benefit the monied capitalist, but to keep in the country and bring into circulation, all the money that was here, and expected that its value, like that of other things, would by competition be reduced to its proper level. If we could be deceived now, as the Legislature were then, by these and similar views, we might think this a good law, and then I presume, according to the argument used, we ought to be disposed to enlarge its operation. But if we are to regard the intention of the Legislature, we must view this statute now, as they did then, and construe it now, as they would then have construed it; otherwise the same statute will import one thing to-day and another thing to-morrow, according to the various and fluctuating opinions of its salutary or unsalutary operation. It is obvious that this would render all private rights uncertain and insecure.

But in construing one part of the statute, every other part should be taken into consideration. The second section of this statute provides, that on all contracts, written or verbal, ascertaining the sum due, where no special premium or rate of interest is expressed, interest shall be taken, &c. at the rate of eight per centum per annum ; thereby clearly implying, that on all contracts where a specific premium or rate of interest is expressed,

JANUARY 1827. (in writing,) it shall be recoverable.  Here is no restric-
tion to loans merely, or to any other particular class of
contracts, but all are spoken of and all are intended.

Jones
v.
Watkins.

Again, a loan implies forbearance, and one cannot be
conceived without the other.  As regards the interest
reserved, it does not matter whether it be on a pre-exist-
ing debt, or on handing over the money from the lender
to the borrower.  If the owner of the money lets another
man keep it for a specific time, he sustains as much in-
convenience in the one case as in the other, and he who
obtains further forbearance of the debt which he was
bound to pay, is as much benefitted as if he had obtained
a loan of the money to discharge it.   To my mind,
neither reason nor law makes any distinction between
the two cases. [a]

[a] Ord on Usury,
23.

It has been urged that there is a strong analogy between
this statute and the fourth section of the English statute
against frauds and perjuries, and that as the decisions on
the constructions of this statute are, that the considera-
tion as well as the promise constitute the agreement, and
both must be in writing; so to bring a contract within
the first section of the statute of 1818, the consideration,
and that consideration a loan, as well as the interest
agreed to be paid, must be expressed in writing.

Without adverting to the well known fact, that this con-
struction of the English statute has been much shaken
by late adjudications, both in England and in the United
States, the decisions shew that they turned upon the legal
import of the word "agreement," taken in connexion
with the consideration of the mischiefs intended to be
remedied by the statute.   The English statute requires
that the agreement shall be in writing, and the considera-
tion is an integral and indispensable part of it.   But our
statute of 1818, only requires that the interest stipulated
and agreed upon, shall be expressed in writing.   One
statute requies the whole agreement, as to which it origi-
nated, and established a new rule of evidence, to be in
writing; the other statute altered the existing law of the
contract as to a part, and not the whole matter to be
agreed on; as to the interest, a mere incident to the prin-
cipal, and has required only this new matter, the rate of
interest to be expressed in writing.   In the decisions on
the statute of frauds and prejuries, it was considered that
there was as strong a temptation to swear falsely to the

.consideration as to the promise. But our Legislature do not seem to have apprehended that one man would attempt to charge another with interest, and extraordinary interest too, without the consideration of the loan or use of the principal, a circumstance which perhaps never did, and never will occur. But they feared that there might be misunderstandings and uncertainty of testimony, as to the rate of interest agreed upon, and therefore required that the rate should be expressed in writing. If we could possibly suppose a case where a man had promised to pay interest, without having in any manner, had the use of the principal, this would be a promise without consideration ; but none of these cases present so strange a feature.

On a full consideration of this part of the subject, I cannot but think that it was the intention of the Legislature in the statute of 1818, to include all contracts on which interest ordinarily accrues. It is stated in these bills, that much of the money paid by the complainants as interest, is on a proper construction of the contracts, to be considered as penalty ; and that thus far they ought to be relieved. Some of these notes were payable at a certain time from the date, and if not punctually paid, were to bear interest at a stated high rate from the date. The parties having used the word *interest*, which has a definite meaning : we should not entirely disregard this circumstance. Yet, if from the whole tenor of the contract, it is evident that they merely intended to provide a penalty, we must view it in that light. Interest is always supposed to be given for the use of the principal. But parties sometimes make their calculations and bargains so as to give day for the payment of the principal without interest, and the creditor provides for the inconvenience of lying out of the use of his money, by an increase of the price of the thing sold. But in such case, if the note be for the payment of interest from the date, if the debt be not punctually paid, this interest from the date, is not as compensation for the use of the principal, for the time between the date and maturity ; for this was already included in the price for which the article was sold, and if interest for this time was paid, the creditor would be doubly compensated. Such a provision then, must have been inserted merely to enforce punctuality ; and is to be considered as a penalty. This has been the uniform view which Courts have taken of such contracts, when made

under laws which restrained or fixed the rate of interest; and I cannot perceive why a different principle should apply to contracts within the operation of the act of 1818. The increased amount of such interest does not lessen its resemblance to a penalty.

The other notes in these cases may be classed under the following heads :

First, To pay the principal at a future day, with interest from the date, at a certain rate, until paid.

Second, To pay the principal at a future day, with interest at a certain rate thereafter, until paid.

Third, To pay the principal at a future day, with interest at a certain rate, without reference to time.

It was contended on the one hand, that these agreements for interest, are in the nature of stipulated damages for the use of the principal until actually paid, and that the whole was recoverable at the rate agreed on ; and on the other hand, that at least, the interest accruing after the maturity of the notes was a penalty.

Penalty is defined to be a forfeiture annexed to a contract or agreement, either for better enforcing a prohibition, or by way of securing the doing of some collateral act agreed on by the parties. Stipulated damages is where there is a clear unequivocal agreement for the payment of a certain sum, as a liquidated satisfaction, fixed and agreed upon by the parties, for the doing, or not doing of certain acts, particularly expressed in the agreement. [a] The object then of a penalty, (which if incurred, is a punishment) is to enforce or prevent by deterring. But stipulated damages, though they may sometimes have the same effect, are designed to ascertain what would otherwise be left to the assessment of a jury. Was then the interest in these cases, stipulated in order to deter the debtors from a failure to pay the principal at maturity? Or was it agred on as a liquidated satisfaction to the lender, in case the use of the principal should be retained after the day appointed for payment? It seems to me that the latter was evidently the design of inserting it.

Where it was agreed that the debt should carry interest before the day of payment, this interest, as admitted on all hands, was intended as satisfaction for the use of the principal, until the maturity of the note. If it was not designed for the same purpose afterwards, should the borrower retain the principal, then that which is interest

a 2 Com. on Con.
465.

for to-day, would be considered penalty for to-morrow, although it is the same amount, at the same rate, given for the same consideration, and agreed for in precisely the same words.   How can the deterring and enforcing principle, which is the very essence of the penalty, be viewed as attaching itself to the payment of a sum to-day, which on yesterday, all admit was nothing but interests? If A. were to contract with B. to pay him at the end of the year, $5 a month, for the use of his plantation, and then to deliver possession, and at the same rate until delivered, none could say that the money to be paid for the use after the expiration of the year, was penalty; but all would agree that it was as much rent as that which arose before.   What is the difference between this case and a contract for the use of money, when the law leaves such contract as unrestrained in its rate as any other contract?   It is true, when the rate of interest is fixed by law, the law cannot be evaded under the semblance of a contract for stipulated damages; and this is the true and avowed reason, why such stipulations annexed to monied contracts, have been adjudged penalties.

Again, a penalty is incurred in gross, and when once incurred, cannot at law be saved in whole or in part. But here the interest was not forfeited at once, but accumulated with the progress of time, and might at any time have been arrested by the payment of the principal. The parties use the very language of the statute, authorizing such contracts. They stipulated for interest to continue to run as compensation for the use of the principal, and it is not usual for men to call that interest which they intend as penalty.

But it is said that there is a great disproportion between the value of money and the price, by these notes agreed to be given for its use.   This indeed would so appear to us now, but perhaps we are not capable of appreciating the value of money when these contracts were made.   The number of cases now depending on this controversy, and the still greater number of contracts of a similar character, known to have been made about the same time with these, certainly tend to prove, that from some cause or other, the use of money was then rated at a high price; or at least, that many persons, and not merely here and there a solitary oppressed and deluded individual, must have placed a high estimate upon it.

But admit this disproportion to its full extent, it cannot
prove that we should not carry the law into effect, or de-
clare these contracts void.    All now perceive that it was
indiscreet for the appellants to make them.    But we are
nevertheless bound to construe them, as we understand
them.    Many other contracts for land, negroes, cotton,
&c. as extravagant as these, were made about the same
time, in the same section of country, and have been, and
must be enforced.    In some of the cases under conside-
ration, there is the same disproportion between the in-
terest agreed to be given for the use of the money, before
and after the maturity of the notes, and if one be avoided
for inadequacy of consideration, so must the other be.
If these notes did not make the makers liable for the in-
terest accruing between the maturity and payment of the
notes, I am at a loss to perceive by what means this could
have been done.    Indeed it seems to be contended, that
no form of contract could have had this effect, and that
the statute must be so construed as to confine the right
to agree for any rate of interest to the time anterior to
the maturity of the note.    In this view, the statute could
have but little operation, unless in cases of long credit,
which lenders would generally be unwilling to give to any
but men of property and known prudence in the manage-
ment of their affairs, and these are not often borrowers.
The law would thus have been rendered almost entirely
inoperative.    This would be an effectual way of extract-
ing the sting from the statute, but as it seems to me, would
be in direct violation of the " *rule prescribed*" by the le-
gislative power.

    It is said that this accumulating interest would ruin
any one, whose misfortunes should render him unable for
a considerable time, to discharge the debt.    So in the
*a* 2 Term 32.    case of Fletcher against Dyche, [a] the £10 a week for
the delay in the performance of the work, might have
ruined the party, if he had long delayed the performance
of his contract.    Yet the Court there held, that it was
stipulated damages, and that the party who had so under-
taken, was liable to pay £40 for a delay of four weeks.

    Why should these contracts be so construed, as to
throw the burthen of high interest on the punctual debtor
only, while he who fails to perform his contracts, is to be
held liable after the debt is due to an interest of only
eight per cent?    He might withhold the money from his

*Jones
v.
Watkins.*

creditor, and lend it to another at a much higher rate.

What is this but allowing a man to be benefited by his own wrong, and holding out to him a temptation to violate his contract?

On a contract for interest, at less than eight per cent, it is clear that the interest would continue from the maturity of the note till the judgement, at the rate contracted for. The rate is different in the different States, it is the mere creature of the law. Our statute of 1818, permitted the parties to contract for any rate. Then if the rate as fixed by the contract, and within the limits prescribed by the law, must in the one case govern from the maturity of the note till the time of judgement, I cannot see why it should not in the other.

On these points, it is my misfortune to differ from those for whose opinions I entertain the highest respect, and it seemed necessary that I should thus in detail, shew the reason of my opinion. These questions on the construction of the statute of 1818, were decided by this Court at June term, 1824, and when I was not a member of the Court, and the opinions then given by a majority of the Judges, are in conflict with mine.

Before this decision was made, the complainants in the cases under consideration, had paid the amount of principal and interest expressed in their notes. In some cases voluntarily, and in others the payment had been enforced by legal process. They now allege, that interest at these high rates, was paid through ignorance and misapprehension of their rights, and of the true construction of the act of 1818; and pray that all that was paid above the principal and interest at eight per cent per annum, may be decreed to be refunded.

It cannot be denied but that by proper defence in a court of law, or by writs of error on the judgements, the complainants might successfully have resisted the payments of which they now complain. Can equity relieve when they have not sought their legal remedy?

In the case of Murfree against Whiting, "the complai- *a* 1 Call. 224. nant sought to be relieved against a judgement, on a replevin bond, which he alleged he had not executed; relief was denied because his defence was at law. In the same book, 550, in a case in which relief was sought on similar principles, Judge Roane says, that he does not believe that there is a single decision of that Court, or of the Courts of England, that will justify the interposition of a Court

JANUARY 1827. of Equity, in a case purely legal, on the ground that the
judgement at law was erroneous. The cases reported in
2 Hen. and Mun. 13, 139; 4 Hen. and Mun. 455, 180;
2 Mun. 1; 1 John. Cases 436, are to the same effect. In
the case of the Auditor against Nicholas *a* all the Court
concurred in opinion to the same effect, though each of
the Judges lamented the extreme hardship of the case. In
1 John. Cases 496, it is said, that not only the matter
which was, but that which might have been put in issue
in the original cause, shall never again be drawn into
examination by a bill of review; and it is not pretended
that a Court of Equity will exercise a different control
over the judgements of other Courts than over its own
decrees. In Simpson against Hart, *b* the Court say that
where courts of law and equity have concurrent jurisdic-
tion, and the question receives a decision at law, equity
can no more re-examine it than a court of law in a simi-
lar case could re-examine a decree in Chancery. In this
case are quoted the strong expressions of Lord Redes-
dale: "I do not know that equity ever does interfere
to grant a trial of a matter that has already been discussed
in a court of law, or matter capable of being discussed
there, and over which a court of law had full jurisdic-
tion. To the same effect are the cases in 1 John. Chan-
cery Reports 543; 3 Id. 279, 395; 4 Id. 92, 569; 17
John. 436; 9 Wheat. 532, and to the same point, many
English authorities might be produced. But these refer-
red to are sufficient I presume, to establish the position,
that where there were suits at law, and the complainants
there had an ample remedy which they failed to pursue,
they cannot be relieved in equity.

As to the cases in which payments were made without
suit, do they exhibit any peculiarity of feature exempting
them from the operation of the maxim *volenti non fit in-
juria?* The complainants claim an exemption on the
ground of their ignorance of the true construction of the
act of 1818. Into this principle I will hereafter examine.

The next question raised is, how far are courts of
equity governed by the statute of limitations? It is con-
tended that where writs of error were not prosecuted
within the time limited by statute, Chancery will so far
notice statute as not to take jurisdiction.

Reason and authority appear to support the position,
that courts of equity as well as courts of common law,
are bound by the statute of limitations. *c*

*Margin notes:*
Jones
v.
Watkins.

*a* 2 Mun. 31.

*b* 1 John. Ch. R. 93.

*c* Sugden on Ven-
dors 271. 3 John.
Ch. R. 222. 10
Ves. jr. 93, 466.
15 Id. 495. 1 Sch.
and Lef. 428. 2
Id. 629. 2 Atk.
240. 6 John. Ch.
R. 289.

By our statute, <sup>a</sup> a bill of review must be brought
within three years, and a bill of review may be considered
in equity what a writ of error is at common law; and if
it would be barred by lapse of time, in ordinary cases at
least, a bill virtually intended to reverse a judgement at
law, and not filed until the time has elapsed for prose-
cuting either a writ of error or bill of review cannot be
sustained.   If a person has lost his right by legal bar he
has no remedy.

Jones
v.
Watkins.
a Laws Ala. 492 1

But it is urged that these cases form exceptions from
the general rule.   First, on the grounds of fraud and trust.
Secondly, because the special matters alleged in the bills
are not specifically decreed.   And thirdly, because the
statute did not begin to run until the complainants were
made acquainted with their rights, which was within the
three years before the bills were filed.

It is true in cases of fraud, the statute of limitations
begins to run only from the time the fraud is discovered. <sup>b</sup>
But all the matter of fraud, oppression or extortion
charged by the bills, is denied by the answers, and is
unsustained by proof; and if it were true, must it not
have been apparent to the appellants from the time of
making the contracts?   What truth was suppressed, or
falsehood suggested, which was not discovered by the
appellants until long afterwards?   Was it the matter of
their liability to pay the interest?   What proof have we
that the defendants knew more of this matter, or had a
more correct opinion of the proper construction of the
statute of 1818, than the complainants and almost all the
lawyers of the State then had; or if the defendants had a
more correct knowledge of this matter, that they fraudu-
lently suppressed it?   As to the phraseology of the notes,
if there was any fraud in it, according to the present pre-
vailing construction of the statute, the fraud was on the
defendants themselves.   But it is contended that the
money having been paid contrary to conscience and good
faith, the defendants hold it as trustees for the complai-
nants.

b Sugden on Ven-
dors 275. 4 Des-
sauss. 479. 5 P.
Wm.143. 1Wash
9, 14.

Wherever there is a continuing subsisting trust, ac-
knowledged and acted upon by the parties, the statute of
limitations will not bar.   But if the trustee denies the
right of the *cestui que trust* and his possession becomes
adverse, from that time the statute begins to run.   Trusts
which are the grounds of an action at law, are not excepted

JANUARY 1827.

Jones
v.
Watkins.

from the operation of the statute. [a] Without further pursuing the authorities, we may rest satisfied with the concurring opinions of the four great and learned men as stated in the cases referred to, that a trust, to escape the bar of the statute, must be of the strict and technical kind over which courts of equity exercise exclusive jurisdiction ; or in the language of Lord Hardwicke, "where there is such a confidence between the parties that no action at law will lie."

If the law were otherwise, the statute of limitations acknowledged by all Courts to be a salutary statute, might be evaded by changing the Court in which the remedy was sought.

As to such of these notes as had embodied the interest which first accrued as principal, the remedy at law might have been incomplete, without the aid of equity for the purpose of discovery. But still the doctrine already stated applies to them, for at most, the jurisdiction of a Court of Chancery was concurrent and not exclusive.

The other objections raised to the operation of the statute, from the peculiar situation of these cases, depend much on the question, whether ignorance of the law will excuse? a question which has called out much of the strength of the argument on both sides. If it were now presented for the first time, and on first principles, it would be presumptuous for me to say that I should entertain no doubt. In this interesting and much agitated question, the brightest ornaments of the English bench, and the ablest jurists and civilians are found in opposing ranks. To apply the maxim indiscriminately, seems often to produce injustice; if it were destroyed as a general principle insurmountable difficulties would arise. Proof of mistakes of facts, can usually be made with reasonable certainty. But proof as to mistakes of law can seldom or never be so attained as to be acted on with safety. Sound policy seems to require as a rule in the administration of justice, that ignorance of the law shall not excuse, although in particular cases it may be painful to apply it. If we resort to the authorities it will appear, that although there may have been some doubts and formerly some respectable decisions to the contrary, yet it is now fully established as a maxim, both in law and equity. [b] The case in 2 Johns. Ch R. 51, has a striking similarity in one of its features to the cases at bar. I will not state the case

[a] 7 John. Ch. R. 113, which cites LdMacclesfield's opinion in the case of Lockley vs. Lockley. 2 Sch. & Lef. 630. Hovenden vs. Ld Annesly. Will's R. 404. 2 Atk. 510.

[b] Eden on Injunctions 8, 10, and the cases there referred to Bilbie vs. Lumley 2 East. 469. 12 Id. 33. 1 Bos. & P. 326. 1 Ves. & B. 30. 2 Com. on Con. 40, 41. 1 Fonb. 115, note v. 5 Taun. 144. 1 John ei ses 495. 2 John. R. 165. 1 John. Ch. R. 515. 2 Id. 51, &c.

at length, but the opinion and language of Chancellor Kent, in this case, well merit attention. "A subsequent decision of a higher Court, in a different case, giving a different exposition of a point of law, from the one declared and known, when a settlement between parties takes place, *cannot have a retrospective* effect, *and overturn such settlement.* The Courts do not undertake to relieve parties from their acts and deeds fairly done, *on a full knowledge of facts, though under a mistake of the law. Every man is to be charged at his peril with the knowledge of the law.* There is no other *principle which is safe and practicable* in the common intercourse of mankind. *And to permit a subsequent judicial decision in any one given case, on a point of law to open and annul every thing that has been done in other cases, of the like kind, for years before, under a different understanding of the law, would lead to the most mischievous consequences. Fortunately for the peace and happiness of society, there is no such pernicious precedent to be found. This case therefore, is to be decided according to the existing state of things when the settlement in question took place.*"

Every one must at first glance see the strong and direct bearing of these principles on the main point in the cases under consideration. True it is, this decree was afterwards reversed by the court of errors, consisting of the Senate and the Judges of the Supreme Court of New-York; but this reversal was by a majority of but one, among the whole number present, and in this majority the name of Spencer alone, as a Judge, is to be found to weigh against Judges Thompson, Yates and Pratt, in reversing on its entire merits, a decree of the discriminating and justly celebrated Chancellor Kent. Without adverting to the fact that Livingston and Van Buren, of the Senate, were of the minority, the weight of judicial authority appears to be in favor of affirmance, and even Judge Spencer, and the twelve Senators who agreed with him in reversing this decree against the opinions of three Judges and nine Senators, did not disturb or contradict the principles laid down by Chancellor Kent, but decided the case upon different grounds. See 14 John. R. 525. It must then be conceded that although a few old, though respectable opinions, may be adduced to the contrary, the decided weight of authority is in support of the maxim *ignorantia juris non excusat.*

Jones
v.
Watkins.

It would be tedious to comment on all the cases cited by the counsel for the complainants on this point; but I think that it would be found either that they have been overruled, or as to the main point on which they turned, were decided upon other principles; and that some of the very strongest of them do not in principle reach the cases at bar. Take for example, the case from Atkins, where it was decided that on a bond intended to be joint and several, but through misapprehension, made joint, the the obligee should be satisfied out of the estate of the deceased obligor, the survivor being insolvent. Suppose that the administrator of the deceased obligor in ignorance of the legal effect of a joint bond, but in pursuance of the real intention of the parties to the contract, had satisfied the bond out of the assets; all will agree that equity would not afterwards have decreed that the money should be refunded because he was ignorant of the law when he paid it. Again, in the case cited from Cook's Reports, Judge White says, if a man is clearly under a mistake of the law, *which mistake is produced by the misrepresentations of the opposite party*, he can be relieved as well as if the mistake were to a matter of fact. Here we have nothing to shew that the mistake of the complainants was induced by the defendants, or that the defendants knew what (as is urged as a main matter in the argument,) the rest of the community were ignorant of. Again, in all the cases cited where the Courts appear to have been in the least influenced by the parties having mistaken the law, or misapprehended his rights, the mistake was clearly shewn. But may we not with great respect for the opinions settling the construction of the act of 1818, say that there cannot be the same certainty here. Two out of the six Judges composing the Court by which the decision was made, continued then to entertain the opinion which had for several days before prevailed with almost all the legal characters whose attention had been called to the subject. An opinion then of but one of the other four, different from that which he then formed, would have produced an equal division of the Court. The Judges composing the majority differed very materially in their views of this statute. Might not the same point be otherwise decided by a different Court? We are it is true, as to all ordinary purposes, to take the law to be as it has been decided by the supreme

tribunal of the country; but is the construction of this statute under these peculiar circumstances, placed so far beyond controversy, as to require this Court to grant relief on the ground that the complainants certainly mistook the law. These complainants appear to have thought their notes legal when they gave them, and when they paid them, and can equity then set aside *in part* contracts which had been executed, and executed in pursuance of the intention of the parties, merely because the complainants did not in time find out that they could have evaded their own intentions, and their contracts? It would seem to me not.

I then am of opinion that, first, where the debt was payable at a future day, and if not punctually paid to carry interest from the date; that the interest from the date till maturity, was a penalty. That with this exception, the interest stipulated and agreed on was legal and recoverable, as well for the time after, as for the time before the maturity of the notes. Second, That when the notes were renewed, and the interest incorporated with the principal, it was also recoverable; at all events the complainants by such renewals having bound themselves to pay what they originally contracted to pay, equity cannot interpose either in these cases, or in the other cases in which judgements at law were recovered, though the renewals may have been made, or the judgements suffered to pass, or the time for suing out writs of error has elapsed, while complainants were ignorant of their rights at law. Third, That where voluntary payments have been made, equity will not revive the contracts for the purpose of setting them aside. Fourth, That where releases of error have been given, they are obligatory.

The case of Harris against Jones' executors, was submitted on bill, and an answer without proof. I am doubtful whether the statute of *non claim* is not available. But a part of the consideration was interest, which was usurious under the act of 1805; which gave a clear and specific remedy by action on the case. It is not shewn by the bill that it was necessary to resort to equity for the purpose of discovery; the bill was therefore properly dismissed.

The principles which I have stated, I believe, meet all the points made in the cases under consideration.

By the CHIEF JUSTICE, JUDGE SAFFOLD, CRENSHAW, and WHITE.

JANUARY 1827.    Let the decree of the Circuit Court in the several cases be affirmed.

Jones
v.
Watkins.

Judge Gayle gave his opinion, that the appellants were entitled to the relief sought, and that the decrees of the Circuit Court should be reversed.   The written opinion is not to be found in the files of the Court.

JUDGE TAYLOR having presided on the trials in the Circuit Court, did not sit.